WILCOX ET AL. V. JACKSON.

1. The failure to record a chattel mortgage is fatal to its validity while the property remains in the hands of the mortgagor. An exception is recognized by the authorities where the possession in fact is in the mortgagee, but the mortgagor, *bona fide* and as agent for the mortgagee, continues to sell and appropriate the proceeds to the payment of the mortgage debt.

| | |
|---|---|
| 7 | 521 |
| 8 | 471 |
| 10 | 293 |
| 7 | 521 |
| 12 | 487 |
| 7 | 521 |
| 13 | 412 |
| B | 521 |
| 14 | 223 |
| 14 | 386 |
| 14 | 599 |
| 7 | 521 |
| 15 | 253 |
| 16 | 333 |
| 7b | 521 |
| 17 | 557 |
| 7b | 521 |
| 2a | 67 |
| 7b | 521 |
| 3a | 154 |
| 3a | 327 |
| 3a | 491 |
| 7b | 521 |
| 4a | 8 |

7b 521
5a 418

7b 521
8a   24

7b 521
24  107

7  521
Case 2
15a 580

7  521
20a 501

7   521
£38  412

2. Where it was shown that new goods were purchased and mixed with the original stock from time to time after the giving of the mortgage, and no testimony establishing the identity of any portion of the goods seized by an attaching creditor, as the same goods mentioned in the mortgage, and the mortgage making no provision for goods to be afterward acquired, *held*, fatal to recovery under the mortgage.

3. Under the statute of frauds, as interpreted by this court, the vendee of chattels must take the actual possession, and the possession must be open, notorious and unequivocal, such as to apprise the community, or those accustomed to deal with the party, that the goods have changed hands and that the title has passed out of the seller to the purchaser.

4. As a rule, when acting in furtherance of the objects and business of the firm and within the scope of its business, one partner is clothed with full powers of all the partners, and is authorized to bind the firm in all transactions. This power and authority is based upon the principle of agency. But one partner cannot, against the opposition of another, make a general assignment for the benefit of a portion of the firm creditors, when such creditors, or their agent, have notice of such opposition.

*Error to District Court of El Paso County.*

THE facts are stated in the opinion.

Messrs. DECKER and YONLEY, for plaintiffs in error.

Mr. WM. HARRISON, for defendant in error.

BECK, C. J.   This is a contest between creditors who are striving to obtain satisfaction of demands due and owing to them, respectively, from the late firm of Tribe & Jefferay, dealers in books, stationery, etc., at Colorado Springs and Leadville.

The goods and effects of the firm in the store at Colorado Springs were seized by the United States marshal, April 6, 1881, upon an attachment against said firm issued out of the United States circuit court for the district of Colorado, at the suit of Jansen, McClurg & Co.

The present action was instituted by W. S. Jackson, another creditor, against the marshal and his deputy, to recover possession of the goods attached, his right to

possession being based upon a chattel mortgage bearing date October 1, 1880, and upon an order for possession, assignment or transfer, of date March 18, 1881; also upon actual possession under said instruments previous to and at the time of the levy of the attachment.

There was a verdict and a judgment below in favor of Jackson, to reverse which judgment this writ of error is prosecuted in the interest of the attaching creditors.

Both the chattel mortgage and the order for possession were executed by the partner George H. Jefferay, in the firm name, without the knowledge or consent of his co-partner, Tribe, and the latter persistently refused to ratify either of these transactions up to the time that the rights of the attaching creditors are alleged to have accrued.

Plaintiffs in error contend that the chattel mortgage was fraudulent and void in law as to creditors upon several grounds, some of which are the following: No memorandum of the acknowledgment was made by the officer taking the same in his docket, as required by statute. The mortgage was not recorded. The goods mortgaged were left in the possession of the mortgagors, who continued to retail the same in the usual course of trade, as before, for their own benefit, with the knowledge and consent of the mortgagee, up to the 18th of March, 1881, a period of five and a half months.

Under our statute, as interpreted by the decisions of this court, either one of the above defects would necessarily have proved fatal to the validity of the mortgage, if the question had been raised while the goods and merchandise continued in the possession of Tribe & Jefferay. General Statutes 1883, pp. 159, 161, secs. 1–10; *Crane et al. v. Chandler*, 5 Col. 21; *Horner v. Stout*, id. 166; *City National Bank v. Goodrich*, 3 Col. 139.

Section 10 of the Chattel Mortgage Act (General Statutes, *supra*) contains a saving clause as to the failure to record the mortgage, when an adverse right to the property is acquired, with actual notice of the existence of the

mortgage. This saving clause does not cure a defective acknowledgment. The failure to properly acknowledge a chattel mortgage is therefore fatal to its validity, while the property remains with the mortgagor. *Crane v. Chandler, supra.*

The authorities also recognize an exception in favor of the mortgagee, where the mortgagor continues to sell the mortgaged goods in the usual course of trade, viz.: where the possession in fact is in the mortgagee, and the mortgagor in good faith, and as agent for the mortgagee, continues to sell and appropriate the proceeds to the payment of the mortgage debt. But any understanding or arrangement, by which the proceeds of sales should go to the mortgagor, or for his benefit, or for any other purpose than the liquidation of this debt, would render the whole transaction fraudulent and void as against creditors of the mortgagor. Jones on Chattel Mortgages, sec. 399, and authorities cited.

In the present case Jackson did not attempt to assume possession or control of the mortgaged property until the 18th day of March, 1881. He admitted, upon the trial, that he permitted the mortgagors to continue their retail trade after the execution of the mortgage, and that they made additions to the stock. He did not pretend that the sales were made for his benefit, or that the proceeds were applied in liquidation of his demands against the firm.

This arrangement was wholly inconsistent with the purposes of the Chattel Mortgage Act. The act was designed to give a creditor security for his claim, by a conditional sale of specific property. To permit a debtor to dispose of the property during the continuance of the lien for any other purpose than in satisfaction of the mortgage debt, would enable him to perpetrate a fraud upon his other creditors. If such a transaction was to be held valid, debtors would have an easy method of protecting their chattel property against the claims of

creditors, leaving to themselves all the benefits of an unincumbered title. It is sufficient to say the law is otherwise. Had the property in controversy been seized upon attachment prior to the 18th day of March, the jury must have been told that the mortgage was void as to creditors.

Another point fatal to a recovery under the mortgage, upon this record, is, that while the testimony shows that new goods were purchased and mixed with the original stock, from time to time, after the giving of the mortgage, there is no testimony establishing the identity of any portion of the goods attached, as the same goods mentioned in the mortgage. The mortgage makes no provision for goods to be afterwards acquired, but is a grant of property owned at the time of its execution.

Mr. Jackson himself declined to swear that the goods attached were the same goods mentioned in his mortgage. He could only swear that they were turned over to him as the same goods.

There could be no recovery under the mortgage upon such a state of facts. *Farmers' Loan & Trust Co. v. Commercial Bank*, 11 Wis. 207; *Same v. Same*, 15 id. 424; *Brainard v. Peck*, 34 Vt. 496; *Cameron v. Marvin*, 26 Kan. 612; Jones on Chattel Mortgages, secs. 167, 168.

It is contended, however, that Mr. Jackson was in *possession* of the property at the time of the levy of the attachment, under the mortgage and under the written order of March 18, 1881, referred to in the record as "Ex. B," and that his possession gave him a prior lien upon the stock.

It appears to be true that Jackson took possession of the store and goods on March 18th; but it is equally true that the character of that possession was such as gave no notice that any change had taken place in the ownership.

Such notice was essential to a right of recovery, under the peculiar circumstances of this case. If anything

was done to afford notice, actual or constructive, the fact was not proven. Section 14 of the statute of "frauds and perjuries" provides that "every sale made by a vendor of goods and chattels in his possession or under his control, and every assignment of goods and chattels, unless the same be accompanied by an immediate delivery and be followed by an actual and continued change of possession of the things sold or assigned, shall be presumed to be fraudulent and void, as against the creditors of the vendor, or the creditors of the person making such assignment, or subsequent purchasers in good faith, and this presumption shall be conclusive." General Statutes, p. 509.

Interpreting this statute, this court has said that "the vendee must take the actual possession, and the possession must be open, notorious and unequivocal, such as to apprise the community, or those who are accustomed to deal with the party, that the goods have changed hands, and that the title has passed out of the seller into the purchaser. This must be determined by the vendee using the usual marks or *indicia* of ownership, and occupying that relation to the thing sold which owners of property generally sustain to their own property." *Cook v. Mann*, 6 Col. 21.

Chief Justice Elbert, who wrote the opinion in the above case, adds that the possession must be exclusive of the vendor, and that a concurrent or joint possession is not admissible.

The evidence in the record does not come within the rule announced. While it shows an actual change in possession, it fails to show that the usual *indicia* of ownership were used by the plaintiff, or that there was a visible change of possession, such as to apprise the community or creditors of the firm of such change. There was, in fact, nothing done, so far as appears, to put persons accustomed to deal with the former firm upon inquiry. The business was continued in the same building,

the goods being sold at retail, as before. The sign of Tribe & Jefferay was not removed, nor was there a new sign put up to indicate a change of proprietors. Jackson did not devote his time to the business, but Charles Jefferay, a brother of the partner, George H. Jefferay, was placed in charge. He was a clerk of the former firm, and, being accustomed to clerk there, his appearance indicated no change. George H. Jefferay continued to be in the store for a considerable time after the transfer, writing up his books, and at times selling goods. The only visible change that appears to have been made was the employment of another clerk, one Curtis.

It cannot be said that the mere employment of an additional clerk in a mercantile establishment is sufficient notice of a change of ownership to put creditors and purchasers upon inquiry. No notice was even given to Cantril, the deputy United States marshal, who levied the attachment, that Jackson had any claim upon the stock. He says he went into the store and inquired of Charles Jefferay if the proprietors were in. The reply was that they were not in; that Tribe was in Leadville, and the other partner was expected that evening. He went out to look up Deputy United States Marshal Dana, and, upon his return, told Charles Jefferay what his business was, made the levy, placed Dana in charge, and proceeded to serve notices of the attachment by leaving a copy at the residence of Tribe, and notifying Jefferay; after which he met a Mr. Wolf, who told him that Jackson had some claim upon the goods, which, he says, was the first information he received of that fact.

Jackson stated in his testimony that he notified the marshal of his claim before the levy, but subsequently corrected himself by saying that he was not at home when the levy was made, but gave the notice afterwards.

Charles Jefferay admits that he was in the store at the time of the levy, but remembers of no conversation with

Cantril. When asked if anything had been done about the store that could be seen by any customer, either outside the door or in the store, to indicate that the business was not being conducted by Tribe & Jefferay, his answer was: "Nothing except by Mr. Curtis being in the store." When asked if he had told people that Jackson had possession of the property, he answered that he had told several who had inquired about it, but could name no one whom he had told.

Mr. Dana, who was a constable at Colorado Springs, and a deputy United States marshal, states that he was in the habit of passing the store and had seen nothing to indicate a change of possession from Tribe & Jefferay to another person. L. J. Tell, a resident, marshal of the city, says he saw nothing to indicate a change.

This being the condition of the testimony, it is our opinion that the question was improperly submitted to the jury, whether Jansen, McClurg & Co., or their agent, had actual notice of the change of ownership previous to or at the time of the levy of the attachment.

It remains to consider the effect of the paper "Exhibit B," as an independent source of title.

This instrument authorized Mr. Jackson to take possession of all the goods and chattels in the store in Colorado Springs, and to sell the same according to the terms of the mortgage, and to apply the proceeds in payment of his demands against the firm of Tribe & Jefferay.

The position of counsel is that this transfer amounted to an independent pledging of the goods and property of the firm for the payment of Jackson's claim.

Counsel for plaintiffs in error deny the power of one partner, under the circumstances of this case, to make such a transfer. They further say that Jackson did not rely on this order upon the trial below, as appears from his own testimony, but upon the mortgage and upon his possession. That the order distinctly referred to the mortgage, and authorized the mortgagee to take posses-

sion of the goods described in the mortgage. That this was its sole purpose and effect.

Upon the last proposition, we are of opinion that the phraseology employed in the latter instrument may be construed as an intention to make an independent transfer of the goods then in the store, together with delivery of possession. This transfer, if valid, would obviate the difficulty of identifying the goods conveyed by the mortgage, and vest a title thereto independent of the mortgage. The reference therein to the mortgage for the terms of sale does not conflict with this theory.

The object of the reference was merely as to the matter of procedure, and in legal contemplation was equivalent to incorporating in the order the same provisions upon this subject which were contained in the mortgage.

The only question of importance to be considered in this connection is: Did the partner Jefferay, under the circumstances of this case, have power, by the execution of this order, to make a valid transfer of the property to Jackson without the knowledge and consent of his co-partner?

The record shows that both partners resided in Colorado Springs, and that they had two stores, one in Colorado Springs and one in Leadville, Lake county; the one containing the principal portion of the stock in trade being in the former place. That Jefferay gave most of his attention to this store, and Tribe looked after the business in Leadville, although he, Tribe, appears to have been frequently at the place of his residence. It is a notorious fact that the two localities are not distant one from the other, and that telegraphic and railroad communication exists between them.

The testimony shows that Tribe was not consulted about this transfer, and that Jefferay and Jackson well knew that he was opposed to the giving of the mortgage and had at different times refused to sign it. We think.

this equivalent to notice that he was opposed to any transfer or assignment of the stock to Jackson.

Another feature of the case, and one which discloses more fully the object of the transaction, is that on the same day on which the property in Colorado Springs was transferred to Jackson by this document (Ex. B), Jefferay confessed judgment in favor of Jackson for the sum of twelve thousand five hundred dollars ($12,500) in the El Paso county district court. Upon this judgment an execution was issued to Lake county, and by virtue of it the entire stock in trade in Leadville, and certain parcels of real estate belonging to the firm, were sold.

Here, then, is presented a case where a partner attempts not only to give a preference to a single creditor, but to give it in such a manner as to divest both partners of possession and control of the entire partnership property, effects and business. His acts were destructive of the partnership itself. These acts were not only done without the knowledge and consent of the copartner, but in opposition to his wishes as previously made known to his partner and to the preferred creditor when they asked him to join in the execution of the mortgage. Can a transfer of this nature, made under such circumstances, be sustained? The power of a partner to act for and in the name of his firm, says Mr. Justice Story, extends to all purposes within the scope and objects of the partnership, and in the course of its trade and business.

Adopting the suggestion of a learned judge, he adds: "One partner, by virtue of that relation (of partnership), is constituted a general agent for another as to all matters within the scope of the partnership dealings, and has communicated to him, by virtue of that relation, all authorities necessary for carrying on the partnership, and all such as are usually exercised by partners in that business in which they are engaged." Story on Partnership, sec. 101.

Among the powers enumerated by this learned author

which may be exercised by one partner within the foregoing limits, is the power and authority, in behalf of the firm, to transfer, pledge, exchange or otherwise dispose of the partnership property and effects.

Mr. Parsons says: "The right of each partner to sell, assign or transfer any part, or the whole, of the partnership property, in the way of the regular business of the partnership, is absolute and unquestioned; * * * this, however, must be done in the regular course of the business of the firm; for, outside of this, he has no such power." Parsons on Partnership, *163.

The views of Mr. Chancellor Kent are to the same effect.   3 Kent Com. (4th ed.) p. 41.

The foregoing paragraphs concisely define the powers of individual partners within the law applicable to general partnerships.   The substance of the rule is, that, when acting in furtherance of the objects and business of the firm, and within the scope of its business, one partner is clothed with full powers of all the partners, and is authorized to bind the firm in all transactions.

This power and authority is based on the principle of agency.   The very nature and purposes of a partnership association necessarily constitute, it is said, each active partner a general agent of the firm, with implied authority to act for it in all matters of business, within the foregoing limits.

The limitation referred to is of the highest importance. Upon it depends, in a large measure, the security of copartners.   When an attempt is made, by a single partner, without the consent of his associates, to bind the partnership in a transaction outside the usual scope of its objects and business, and one prejudicial to its interests, every principle of justice requires that courts should hold the act to be without validity.   Especially should this be done where, as in the present case, the contracting parties have notice of the copartner's dissent to such transaction.

The doctrine as to the effect of notice is thus stated in 1 Am. Lead. Cases, 544: "The authority in a single partner, however, is not an inseparable legal consequence of an interest in the partnership, but is an actual agency implied from the supposed assent of the other members; an express notice, therefore, from one member of a firm, communicated to third persons, that he will not be bound by the acts, or by a particular act, of another partner, puts a stop to the implied authority of that partner to bind the firm." With these general principles before us, let us inquire more closely into the character of the transfer in the case at bar.

It was clearly not a sale, for no price was agreed upon at which the goods and effects should be taken and credited upon the indebtedness of the firm. Had it been an absolute transfer of the property in extinguishment of the debt, or a certain portion of it, a different question would arise.

Nor was it a pledge, for authority was given to sell all the property transferred. A pledge is defined to be a lien created by the owner of personal property by the mere delivery of it to another, upon an express or implied understanding that it shall be retained as security for an existing or future debt. A pledge is subject to redemption, and the lien is immediately divested by a tender of the amount secured.

An action for possession may be maintained by the pledgor, if the pledgee refuses to restore the property. The title to the property remains in the pledgor, while the possession, actual or constructive, according to the nature of the property or circumstances of the case, is with the pledgee. The latter can only sell upon default of the pledgor to pay according to the contract. Bouvier's Law Dictionary, title "Pledge;" 2 Parsons on Contracts, pp. 109, 117; 3 id. 271.

In *Bowie & Sons v. Napier & Co.* 1 McCord, 1, the court say: "By a pledge, we understand not only a

thing that may be redeemed, but generally one that is intended to be redeemed. Now, where goods are deposited with orders to sell, such an idea as that of redemption can never enter the mind, for the agent with whom they are deposited may, in the shortest space of time, alienate the right."

The effect of the transaction in the present instance was to transfer and surrender the property and stock in trade for the benefit of a single creditor, and at the same time to constitute such creditor the trustee of an implied or resulting trust in favor of the firm; the terms of the trust were that Jackson should sell the property in a specified manner and apply the proceeds in liquidation of his claim.

If any surplus of money or property remained after satisfaction of his demands, as might have been the case considering the simultaneous confession of judgment by the same partner, the assignee was bound to return the same.

It is evident, then, that this transfer was in the nature of, or analogous to, a voluntary assignment for the benefit of a creditor of the firm.

Says Mr. Burrill in his valuable work upon assignments: " Voluntary assignments for the benefit of creditors are transfers, without compulsion of law, by debtors, of some or all of their property to an assignee or assignees, in trust, to apply the same, or the proceeds thereof, to the payment of some or all of their debts, and to return the surplus, if any, to the debtor." *   *   *

The trusts of an assignment for the benefit of creditors, in one form or other, enter into the composition of all assignments which contemplate provision or security for creditors, embracing not only such as are made to trustees, but such as are made directly to creditors themselves. Implied or resulting trusts are such as result from the transfer by intendment and operation of law. Burrill on Assignments, secs. 2, 238, 240.

Both Mr. Justice Story and Mr. Parsons express grave doubts whether a partner can make a general assignment of all the property and effects of the partnership for the benefit of creditors. These doubts arise from the consideration that such a transaction is not in furtherance of the objects of a partnership, but of itself operates as a dissolution. Story on Partnership, sec. 101; Parsons on Part. p. *166.

Mr. Parsons thinks the weight of authority is in favor of the power where the assignment is made without preferences of any kind. He qualifies the doctrine still further in a note to page *167, after reviewing the cases on the subject. The further qualification is: "if such an act is justified by the situation of the firm at the time, and if the other partners are absent from the country, or have made the assignor sole managing partner, or if in any other way, expressly or by implication, they may be supposed to have conferred upon the assigning partner sufficiently extensive authority."

The case under consideration does not come within any of the exceptions mentioned. The other partner was not absent from the country. No emergency existed to justify or excuse hasty action without consultation with the copartner. Jefferay had not been constituted sole managing partner at Colorado Springs, as appears from Tribe's repeated refusals to ratify the mortgage, and from his visit to and conduct at the latter place upon hearing of the transfer.

Considering the contemporary acts of making this assignment and confessing the judgment in opposition to the known wishes of his copartner, and in the light of their natural and actual consequences, viz., the destruction of the partnership business in both places, it is evident that the acts of March 18th were not based upon a supposed power of sole management at one point, but upon an assumed power of sole control, *nolens volens*, at both points and over the entire partnership business

and property. The acts of Jefferay of March 18th were as destructive of the partnership as if the whole property of the firm had been included in a general assignment. These acts being contemporary, and having the effect of a general assignment for the benefit of a creditor, the law applicable to a general assignment becomes, by analogy, applicable to the assignment in the present case.

Concerning the power to make such an assignment Mr. Justice Washington says: "But it may admit of serious doubt whether one partner can, without the consent of his associates, assign the whole of the partnership effects (otherwise than in the course of trade in which the firm is engaged) in such manner as to terminate the partnership." *Lord v. Graham*, 4 Wash. C. C. 232.

The authorities bearing upon the subject are reviewed in *Bowen v. Clark*, 1 Bissell, 128. The conclusion arrived at is as follows: "The principle to be extracted from nearly all the decisions appears to be this: that as a general assignment, if it does not dissolve the partnership, at least takes away from the partners the right of disposing of the effects assigned, all the members, if they are present, have a right to be consulted on such a step; that an assignment by one partner against the known wishes of another would be a fraud upon him and invalid, and an assignment without his knowledge would be presumptively so."

The New York court of appeals held, in *Wells v. March*, 30 N. Y. 350, that such an act was outside the scope of the partnership enterprise, and that the exercise of such a power amounted to a suspension or dissolution of the partnership itself. Said Mr. Justice Wright: "It is no part of the ordinary business of the partnership, but outside and subversive of it. No such authority as that can be implied from the partnership relation."

The question was considered in *Holland v. Drake*, 29 Ohio St. 441, "whether one member of an insolvent

firm, either before or after the dissolution of the partnership, can make a valid assignment of all its effects for the benefit of creditors against the will of a copartner, or without procuring his assent, when present or accessible."

Chief Justice Welch, in delivering the opinion of the court, speaks of the want of uniformity in the numerous decisions, and concludes as follows:

"We have examined these cases with much care, and think the weight of authority, as well as the better reasoning, is with those who deny the validity of such an assignment. The power to make it is not within the contemplation of an ordinary partnership contract." The opinion of the court is that the safer and juster rule is to require either the actual or implied assent of all the partners.

The court of appeals of Kentucky concedes the power and authority of each partner, in behalf of the firm, to transfer, pledge or dispose of the partnership effects and property for any and all purposes within the scope of the partnership and in the course of its trade and business, but declares it to be well settled upon principle and authority, that one partner cannot, against the opposition of another, make a general assignment for the benefit of a portion of the firm creditors, when such creditors or their agent had notice of such opposition. *Bull v. Harris, etc.* 18 B. Monroe, 195.

Respecting the *implied* power of a partner to make such an assignment without the knowledge or consent of a copartner, Chancellor Farnsworth says, in *Kirby v. Ingersol*, Harrington's Ch. (Mich.), pp. 172–186: "There is no such implied power. The authority impliedly vested by each partner in the other is for the purpose of carrying on the concern, and not for the purpose of breaking it up and destroying it. One partner does not, by any implication, confer a power upon his copartner of divesting him of all interest in or authority over the con-

cern. The elementary writers upon the subject do not sustain this position. The adjudged cases, when carefully examined, do not sustain it; and assuredly it is not sustained by the reason of the thing or the dictates of justice. Every consideration of public policy or commercial convenience is against it."

Being of opinion that the authorities cited announce correct legal principles, and that they are applicable to transfers of the nature of the one under consideration, made under the circumstances disclosed by the evidence, we hold that the paper, "Exhibit B," conveyed no title of itself and created no independent lien in favor of the plaintiff below, as against the creditors of the firm of Tribe & Jefferay.

Inasmuch, therefore, as the trial below was conducted upon a theory at variance with the views of the majority of the court upon several points, the judgment is reversed and the cause remanded.

*Reversed.*

Mr. Justice HELM took no part in the decision.