## HERR v. DENVER MILLING & MERCANTILE CO.

1. OMISSION OF NAME OF GRANTEE.— As against a vendee of the mortgagor, a chattel mortgage which does not contain the name of the grantee is a nullity, although acknowledged and recorded.

2. SALE AND DELIVERY OF PERSONAL PROPERTY.— Where a chattel mortgage proves defective, and the supposed mortgagee assumes to be a purchaser of the property, he must take actual possession,

and it must be open, notorious and unequivocal, such as to apprise those accustomed to deal with the vendor that the goods have changed hands, and that the title has passed out of the seller into the purchaser.

### Error to Superior Court of Denver.

Mr. C. B. WHITFORD, for plaintiff in error.

Mr. L. B. FRANCE, for defendant in error.

REED, C.    An action in the nature of an action in trover, to recover the value of wheat, tried in justice's court, from which an appeal was taken to the superior court of the city of Denver.   On April 29th a trial was had by the court without a jury, resulting in judgment for the defendant, the Denver Milling & Mercantile Co. A motion for a new trial was made, and denied.

There is but little controversy in regard to the facts. The principal contention is in regard to the law applicable to the facts.   It appears that Mrs. F. E. Sweetzer, a married woman living with her husband, leased from the Platte Land Company one hundred and sixty acres of land, subleased eighty acres, and, with her husband, put the other eighty acres into wheat.   Some time prior to September 1, 1884, R. B. Sweetzer (the husband) and F. E. Sweetzer were, or one of them was, indebted to one S. H. Brackbill, and had jointly executed to him a promissory note and secured it by chattel mortgage. Brackbill wanting his money, an arrangement was made whereby plaintiff Lorenzo D. Herr was to take up the note, and the Sweetzers were to make a new note to him, to be secured by chattel mortgage upon the same personal property formerly mortgaged to Brackbill; among which was the eighty acres of wheat on the ground before spoken of.   A note was drawn September 1, 1884, for $429.20, payable to the order of plaintiff, executed by both the Sweetzers, and across the note was written: "Secured by chattel mortgage on wheat, teams, etc."

An attempt was made to make and execute a chattel mortgage, and the paper executed appears to have been regular, except that there was no grantee in the convey- ance, the space where it should have been being left blank. Why the name of the grantee was left out there is no attempt to explain. When, if ever, the grantors discovered the defect is not disclosed; but it appears in the testimony of plaintiff that they regarded it as a valid and existing mortgage on the wheat at or about the time of the delivery of the wheat out of which this contention arose. It is shown that Sweetzer hauled, delivered and sold to defendant four loads, as his own and in his own name, drawing a small sum of money and taking milling receipts to himself for the balance, leaving about $100 due on the price of the wheat. The evidence in regard to the notice to defendant is very meager. It is not claimed that defendant had any knowledge in reference to the claim of the plaintiff until after the wheat was bought and delivered. There is no evidence of plaintiff's notifying defendant of his supposed rights, or of having any conversation with him at all. The only notice or conversations on the subject testified to were those of plaintiff's brother, T. W. Herr, and it nowhere appears that he was authorized or the agent of plaintiff. That G. E. Smith, a witness, and party who purchased the wheat, was the agent of defendant, is admitted. The evidence on the subject of notice is that of T. W. Herr and J. K. Mullen. Herr testified as follows: "I had a conversation with the agent of defendant in reference to this matter. It was with the person in charge of the mill, — I think it was Mr. Smith. In the conversation I had with Smith at the mill I asked him if he had bought wheat from a man named Sweetzer. He said he had. I asked him how much. He said four loads. Subsequent to the interview with Mr. Smith I had a conversation with J. K. Mullen in regard to this transaction. I don't remember where I first saw him about it; but he spoke

about it once on Curtis street, in front of the postoffice, and he said they had about $100 in their hands, or something over $100; that it was immaterial who he paid it to; that he had been garnished by somebody, but he didn't know who it was.   Before the commencement of this suit I notified the defendant that this wheat was ours.   I did so at the mill at the time I spoke of before. I told Mr. Smith that the wheat was ours — that my brother had a chattel mortgage on it; and I showed him the chattel mortgage.   I did not notice that it had no grantee in it at that time.   I showed him the chattel mortgage, and told him that the wheat had all been turned over to us, and that it was our wheat, and that he should not pay Sweetzer any money on account of it. At that time he told me he had made some little advancement on it, — a few dollars, — but that he would not pay more until he knew they had a right to, or something to that effect.   I made a demand on the defendant for the price they agreed to pay Sweetzer, and asked him to pay me.   He said he would see about it.   They never paid anything.   I went afterwards, and they said they were garnished and they could not pay now.   I told the defendant where the wheat came from; showed them the chattel mortgage; that the quarter section of wheat belonged to Mrs. Sweetzer.   It was about the last of September, 1884, that I had this conversation with Mr. Smith.   I don't know that he said he bought the wheat of Sweetzer, but he said Sweetzer had delivered four loads there.   When I asked him for the money, and to pay us, he said the receipts were out for it.   I can't remember how long after the wheat had been delivered that I had this conversation with Smith.   It may have been two or three days, or a week.   I am not certain.   I got no wheat from Sweetzer after that conversation with Smith. Sweetzer left the country."

J. K. Mullen testified: "Am acquainted with R. B. Sweetzer by meeting him a few times.   He was farming

in the fall of 1884. In the fall of that year our manager
bought wheat of him. It was in September, 1884. He
brought the wheat to the mill in our sacks, and dumped
it into the hopper outside, with other wheat. We only
paid him $11.20 on that sale. Delivered him receipts for
the wheat. We bought no wheat from Sweetzer after a
conversation had with Mr. Herr in relation to the wheat.
That conversation is the first I ever heard of Mr. Herr
having a claim on it. At that time the wheat had been
delivered and the receipts received. Mr. Herr came
down to see me about this matter. He gave notice that
he had a claim on it. He saw me and talked with me
about it. A good while after I told Mr. Herr that we
had the money there, and would pay it to whoever was
lawfully entitled to it. The money is still in our hands,
except the $11.20." (The garnishee process from the
county court, and the summons in this case, were both
served on the same day. Witness could not state which
was first served.) "Mr. Sweetzer came and demanded
the money, and we notified him of the fact that Mr. Herr
had notified us. He left something there in writing;
and we notified Mr. Sweetzer we could not pay him
until the matter was settled in the courts."

It appears from the testimony that no sacks were fur-
nished by plaintiff at the time of threshing, as required
by Sweetzer. Strong, a witness, testified that he got for
himself five hundred sacks of the defendant, one hundred
of which he let Sweetzer have. It appears that the
wheat sold defendant was delivered in those sacks. The
defendant put in evidence the transcript of a record and
judgment in the county court, wherein the W. J. Kin-
sey Implement Company obtained judgment by default
against R. B. Sweetzer, for $111.65 and costs, on the
15th day of October, 1884; that the Denver Milling &
Mercantile Company had been served with garnishee
process on the 10th day of October, 1884, whereby it was
commanded to retain possession of money and property

in its hands belonging to R. B. Sweetzer, that it might be dealt with according to law.

Although the facts are few and easily understood, and the testimony not contradictory,. the case is one of some difficulty; the controversy having arisen between the party assuming to be the mortgagee and a third party — the supposed mortgagor having left the country. All the evidence in support of the mortgage, and the doings and declarations and acts of the parties under it, comes necessarily from the plaintiff.

The first question to be determined is: Was there a delivery or transfer of the possession of the wheat by the mortgagors to the plaintiff, under the mortgagee, previous to the delivery of the wheat by R. B. Sweetzer to the defendant? Theo. W. Herr, brother of plaintiff, said: "Mrs. Sweetzer turned the wheat over to me." There is no evidence of any agency, or of any authority from the plaintiff to the Sweetzers to turn the wheat over to him, or to the witness receiving it for him. There is no evidence of any attempted transfer of possession to plaintiff. All through the witness says, in speaking of it, "me," or "I," or "we," as if he were the party, or the transaction was one in which he and plaintiff were jointly interested. Unless the agency of T. W. Herr is presumed, as it was not proved, the discussion of this part of the case might end here. There is no proof of any demand on the part of the plaintiff for possession, or any attempt or intention on the part of the Sweetzers to deliver to him. Assuming that he was the agent, and the proper person to transact the business, we find his statement that Mrs. Sweetzer did turn the wheat over to him was merely his conclusion, and one not warranted by the facts. He appears to have treated her alleged statements of willingness and intention as equivalent to doing the act. It is evident from the evidence that he did not furnish the sacks; did not go after the grain after it was threshed, and receive possession of it; the

Sweetzers did not deliver the possession; and that the possession of the four loads in controversy remained in them until delivery to defendant. In *Cook v. Mann*, 6 Colo. 21, cited and approved in *Wilcox v. Jackson*, 7 Colo. 521, Elbert, C. J., said: "The vendee must take the actual possession; and the possession must be open, notorious and unequivocal, such as to apprise the community, or those who are accustomed to deal with the party, that the goods have changed hands and that the title has passed out of the seller and into the purchaser. This must be determined by the vendee using the usual marks or *indicia* of ownership, and occupying that relation to the thing sold which owners of property generally sustain to their own property."

To establish the plaintiff's right to recovery on the ground of a delivery, as claimed by counsel, there should have been positive proof of an actual delivery on the part of the Sweetzers, and an acceptance by plaintiff, either in person or by an authorized agent; and an actual, notorious and unequivocal change of possession. The law upon this point has been positively and clearly asserted by ELBERT, C. J., in *Cook v. Mann, supra*, and by BECK, C. J., in *Wilcox v. Jackson, supra*, and perhaps in other cases, and is a rule of law that has been almost universally accepted in construing the statute of frauds in force in this state. A careful examination of the evidence will make it apparent that the proof in this case fell far short of establishing the necessary facts under the law. Failing to establish a delivery, acceptance and absolute change of possession of the wheat, plaintiff could only succeed by proof of a legal, valid and existing mortgage of the property at the time of the sale and alleged conversion. The paper relied upon as a conveyance, although, as appears, properly executed by grantors, acknowledged and recorded, contained no mortgagee or grantee. For the protection of purchasers of personal property, and the prevention of fraud by means

of fictitious chattel mortgages, the legislature has wisely required the same formal and solemn execution, acknowledgment and recording of such conveyances as in the conveyance of real estate.   And, if authorities are wanting to determine the validity and construction of this class of conveyances, the legality of the instrument in question can readily be determined from decisions in regard to conveyances of real estate and other instruments requiring the same formalities and essentials as are required in chattel mortgages by our statute.   In 1 Schouler, Pers. Prop. p. 541, after stating the object, intention and necessity of acknowledgment, recording, etc., it is said: "In this aspect, then, the law of chattel mortgages comes to resemble more closely than ever that of real-estate mortgages."   The oldest authority found on the subject is in Shep. Touch. 54, where it is said: "Every deed, well made, must be written; i. e., the agreement must be all written before the sealing and delivery of it."

In the case of *Chauncey v. Arnold*, 24 N. Y. 330, there was, as in this case, a mortgage with no grantee, and the paper so remained with the blank unfilled when produced in court.   In delivering the opinion, Denio, J., said: "The question, therefore, is whether the paper in question, defective as it is, by the omission of the name of the plaintiff as the party in whose favor it is alleged to have been executed, can nevertheless be sustained as a deed mortgaging the property to him.   If we take into consideration only what is written, the paper is wholly without meaning.   A transfer to a person not named, or in any way described or designated, is, unconnected with anything else, a mere nullity."   Smith, J. (concurring), said: "The single question presented upon this appeal is whether the judge at the circuit erred in excluding the mortgage purporting to have been executed by Mrs. Arnold when the same was offered in evidence.   I think there can scarcely be any doubt that the decision was entirely correct.   The paper called a 'mortgage' was

not, in fact, in any sense a deed. It was entirely incomplete. Upon its face it was an imperfect instrument. No mortgagee or obligee was named in it, and no right to maintain an action thereon or to enforce the same was given therein to the plaintiff or any other person. It was *per se* of no more legal force than a simple piece of blank paper. * * * Delivery is essential to the validity of a deed. When the deed is perfect upon its face, possession by the grantee named therein is presumptive evidence of a proper delivery."

In *Drury v. Foster*, 2 Wall. 24, the paper purporting to be a mortgage was left with blanks for the insertion of the mortgagee's name and the sum borrowed, to be filled up by the husband. The court, by Mr. Justice Nelson, says: "*Second.* There could be no acknowledgment of the deed, within the requisitions of the statute, until the blanks were filled and the instrument complete. Till then there was no deed to be acknowledged. The acts of the *feme covert*, and of the officers, were nullities, and the form of the acknowledgment annexed as much waste paper as the blank mortgage itself, at the time of signing."

In *Preston v. Hull*, 23 Grat. 600, it is said of a bond executed and delivered without an obligee: "A writing, though executed with all the solemnities of a deed, without such obligee, is a mere nullity. It imposes no liability upon the party issuing it. It confers no rights upon him who receives or holds it. It is not simply an imperfect deed. It is no deed at all. It only becomes a deed when the name of an obligee is inserted, and delivery made by the obligee, or by some one legally authorized by him."

In *Upton v. Archer*, 41 Cal. 85, it is said: "When that instrument was left with Webster by the plaintiff, it was not his deed, for the obvious reason that there was only one party to it. No one could convert it into his deed except the plaintiff himself, or some one by him thereto

duly authorized, and it could not become the plaintiff's deed until the name of a grantee was inserted." See *Squire v. Whitton*, 1 H. L. Cas. 333.

In *Simms v. Hervey*, 19 Iowa, 274, Dillon, J., decided, briefly and broadly, as follows: "Under our statute, as at common law, a grantor, a grantee and a thing to be granted must all be described in a deed; and an instrument in which any of these are omitted is not legally executed and can convey no title."

In Will. Real Est. 377: "A grant, to be valid, must be to a corporation, or to some certain person named, who can take by force of the grant and hold in his own right or as trustee." See, also, *Meighen v. Strong*, 6 Minn. 177 (Gil. 111); *Conover v. Porter*, 14 Ohio St. 450; *People v. Organ*, 27 Ill. 29.

The conclusion is that the paper was no chattel mortgage when, as in this case, the proceeding is against a third party. And this must be so on reason. The object and intention of the legislature in requiring the same formalities in executing, acknowledging and recording as in mortgages and conveyances of real estate was not to protect the parties to the instrument, but to protect creditors and purchasers from fraud where, as in this state, the chattels are allowed to remain in the possession of the mortgagor until after default in payment. Hence, our statute requires these formalities, and that the instrument be recorded for the purpose of being constructive notice and a protection. In this case the paper could be no notice of anything. If such a paper is to be construed as a conveyance, then only one party is needed, and any failing or dishonest debtor could retain the property by his own act in making and filing a paper. The instrument in this case could only have been made valid between the supposed original parties by the filling up of the blank and a redelivery by the mortgagors. I am aware that there is a line of cases holding that, where a note and chattel mortgage are executed with a blank for

payee and mortgagee, and placed in the hands of an agent to raise money, with verbal authority to fill the blanks and deliver the papers, the transaction is held valid, and to a certain extent they are treated as commercial paper; and probably correctly so.   But this is on the theory, and can only be, that the party negotiating the loan is the agent of the maker, but the papers when delivered are complete, and the act of the agent in filling the blanks and making delivery is regarded as the acts of the maker.   But in no case have these papers ever been held valid without parol proof of the direction and authority to fill the blanks and make the delivery.   A glance will show that this does not fall into that line of cases.

The claim of plaintiff's counsel that, if plaintiff did not take title to the wheat under the defective mortgage, he took title by the assignment of the Brackbill mortgage, cannot be sustained.   If that mortgage had not become *functus officio* by its terms and the lapse of time, it was made so by the acts of the parties.   Their intention, as shown by the evidence, was to cancel those papers and substitute others.   That mortgage was not made to secure the note relied upon in this case, but another and different one, which, for all that appears, was canceled and destroyed.   It is well settled in this class of cases that the note is the principal thing; the mortgage collateral or incidental to it.   Hence the mortgage was worthless without the production of the note, which was not produced or sought to be recovered upon.   Neither can it be successfully held, as contended in argument, that the recital in the second mortgage made to Buell & Buell was notice to the defendant under the statute.   That record could only be notice of that lien.   Had defendant been required — which he was not — to see that record, he would not have been aided, as the recital was in regard to a deed which had no existence.   If parties lose the benefits of securities through inattention to and carelessness in their

business, courts cannot assist them. The actual control and possession of personal property, without notice, is *prima facie* indicative of ownership at law. And where, as in this case, one of two parties must suffer for the wrongful act of the third, the loss must fall upon him who, having the means of preventing it, through carelessness or inattention allows a purchaser to be misled. The judgment of the court below should be affirmed.

RICHMOND and PATTISON, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion the judgment of the superior court is affirmed.

*Affirmed.*